# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

———————————————————————  )
                                              )
**FAHRAN ROBB,**                  )
                                              )       **Case No. 20-cv-929 (GMH)**
                   **Plaintiff,**        )
                                              )
**v.**                                       )
                                              )
**BROOKE ROLLINS, Secretary,**    )
**United States Department of Agriculture,** )
                                              )
                   **Defendant.**[1]    )
                                              )
———————————————————————  )

## <u>MEMORANDUM OPINION AND ORDER</u>

In this action, Plaintiff Fahran Robb claims that managers at her erstwhile employer, the Department of Agriculture ("Defendant," the "Department," or "the government") violated the Rehabilitation Act, 29 U.S.C. § 12101 *et seq.*, and Title VII, 42 U.S.C. § 2000e *et seq.*, by engaging in acts of disability and gender-based discrimination and retaliation. More specifically, Plaintiff describes this case as "centered on one basic allegation; namely, that the Defendant effectively demoted her from a GS-14 position, promised it back to her, then erected barriers stopping the Plaintiff from getting back her original position" but it also includes claims related to discipline imposed on her and claims that the government "delay[ed] . . . reasonable accommodations for her disability." ECF No. 59 at 2. Defendant has filed a motion seeking summary judgment on most,

---

[1] Secretary of Agriculture Brooke Rollins is substituted as Defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 25(d). Because "[a]n official-capacity suit against an agency or agent of the federal government is the equivalent of a suit against the United States of America," *Davis v. Mukasey*, 669 F. Supp. 2d 45, 49 (D.D.C. 2009), the Court does not refer herein to the Secretary herself as the defendant.

but not all, of Plaintiff's claims.[2]  For the reasons that follow, Defendant's motion is granted in part and denied in part.

## I.    BACKGROUND

Plaintiff's amended complaint alleges a multitude of employment actions she asserts were harmful, even if not all were sufficiently adverse to be actionable on their own, and it is not always clear which of those actions relate to which of the four causes of action that survive after Judge Contreras' decision on Defendant's motion to dismiss and Plaintiff's motion to amend her complaint.[3]  *See Robb v. Vilsack*, No. 20-cv-929, 2021 WL 3036796 (D.D.C. July 19, 2021).  Those live causes of action are failure to accommodate in violation of the Rehabilitation Act (Count I), disability discrimination in violation of the Rehabilitation Act (Count II), gender discrimination in violation of Title VII (Count III), and retaliation in violation of the Rehabilitation Act and Title VII (Count IV).  *See generally* ECF No. 16-2, ¶¶ 20–160, 171–223.  Although noting that the operative complaint's "kitchen-sink presentation of allegations . . . makes for laborious analysis," Defendant has moved for summary judgment on each of those claims (with two carve-outs noted below).  *See generally* ECF No. 56-1 at 25–36.  Sensibly, Plaintiff's opposition to Defendant's motion for summary judgment brings into focus the claims she still presses.

---

[2] The documents most relevant to this Memorandum Opinion and Order are: (1) Defendant's motion for summary judgment, its Statement of Material Facts, and the accompanying exhibits, ECF Nos. 56-1, 56-2, and 56-3 through 56-26; Plaintiff's opposition, her Response to Defendant's Statement of Material Facts, and the accompanying exhibits, ECF Nos. 59, 59-1, and 59-2; and Defendant's reply and accompanying exhibits, ECF Nos. 72 and 72-1 through 72-10.  The page numbers cited herein are those assigned by the Court's CM/ECF system.

[3] Prior to this case being referred to the undersigned for all purposes on the consent of the parties, *see* ECF Nos. 28, 30, Judge Contreras ruled on those two motions and dismissed a claim related to revocation of Plaintiff's security clearance, a claim under the Fifth Amendment, and discrimination and retaliation claims based on the investigation of an incident involving a co-worker in November 2017 and on letters of caution issued on December 8, 2017, and March 8, 2018—although the court recognized that the investigation and letters of caution "may have evidentiary value in support of [Plaintiff's] central claim that she was improperly prevented from regaining her GS-14 grade level and attendant pay."  *Robb v. Vilsack*, No. 20-cv-929, 2021 WL 3036796, at *9, *13 (D.D.C. July 19, 2021).  He also permitted Plaintiff to add retaliation and discrimination claims based on the denial of Plaintiff's request to complete a certification program in federal human resources management and an allegedly improper reduction in Plaintiff's leave.  *See id.* at *14–15.

Plaintiff clarifies in her opposition that she opposes Defendant's motion for summary judgment only "with respect to four actions":  (1) the reduction of her duties and responsibilities, which she claims was based on gender, (2) a five-day suspension, which she claims was retaliatory; (3) the failure to accommodate her disability; and (4) her termination, which she claims was due to gender discrimination, disability discrimination, and retaliation.  ECF No. 59 at 5–6.  Plaintiff points out that Defendant has not moved for summary judgment on her retaliation and discrimination claims based on the denial of her request to participate in a federal human resources management certification program and an allegedly improper reduction of her leave, both claims that Judge Contreras' earlier decision allowed to proceed.  *See* ECF No. 59 at 6; *see also Robb*, 2021 WL 3036796, at *14–15 (finding that Plaintiff had met the pleading burden for discrimination and retaliation claims based on both actions).  Those two claims will go forward.

The fourth claim—the termination claim—is not at issue here.  Although the parties include some briefing on it in this case, both parties acknowledge that it is the focus of a separate case in this District—*Robb v. Rollins*, 21-cv-2056 (D.D.C. July 29, 2021), which is before Judge Bates and referred to the undersigned for full case management—and is not raised in this case.  *See* ECF No. 56-1 at 3 (Defendant asserting that "Plaintiff has filed a related action, *Robb v. Vilsack*, Civ. A. No. 21-2056 (GMH/JDB) (D.D.C.) ('*Robb II*'), alleging wrongful termination from federal service due to gender and disability, and whistleblower retaliation. That suit has been consolidated with this action and is pending before this Court for all purposes up to but excluding trial.  A separate motion for summary judgment is being filed in *Robb II*, which relies on and makes reference to, the facts submitted in this case, but which includes additional facts pertinent to that case" (citation omitted)); ECF No. 59 at 6 (Plaintiff asserting that the wrongful termination claims "are the subject of the other case, *Robb v. Vilsack*, 21-cv-02056").  The operative complaint in this case

confirms as much, noting that the Department "proposed" her termination but failing to plead a claim based on her actual termination. *See* ECF No. 16-2, ¶¶ 185, 197, 227–229. "It is well established that a party may not amend its complaint or broaden its claims through summary judgment briefing." *District of Columbia v. Barrie*, 741 F. Supp. 2d 250, 263 (D.D.C. 2010); *see also Klayman v. Judicial Watch, Inc.*, 628 F. Supp. 2d 112, 126 (D.D.C. 2009) (refusing to consider on summary judgment allegations not included in the operative complaint). The Court therefore does not address that claim here.[4]

Accordingly, based on Plaintiff's concession that she opposes summary judgment in *this* case only as to her Title VII gender discrimination claim based on the reduction of her duties and responsibilities, (2) her retaliation claim based on a suspension from duty, and (3) her Rehabilitation Act claim based on a failure to provide reasonable accommodations, ECF No. 59 at 5–6, 13, those are the only claims the Court addresses herein. The reduction in duties of which Plaintiff complains comprises "being left out of a key ethanol meeting" on August 1, 2017, and of "two China ethanol taskers" in May 2018; and reductions in her opportunities to provide "scientific and policy advice regarding emerging biofuels and bioenergy issues," to represent the agency "on biofuels and bioenergy in international meetings" and "as a technical expert at meetings with other agencies," to "participat[e] in educational seminars," and to "consult[] with staff of domestic and foreign industry and trade associations." *Robb*, 2021 WL 3036796, at *11 & n.9 (quoting ECF No. 16-2, ¶ 38). The retaliation claim is based on a five-day suspension imposed on February 25, 2019, which was preceded by letters of instruction, warnings, and a reprimand. ECF No. 59 at 5;

---

[4] Leaving the termination claim to the case in which it was properly raised also makes good practical sense, as to do otherwise would needlessly complicate matters. For example, if the undersigned ruled on the claim here, that ruling might be preclusive as to the claim in Judge Bates' case—an odd outcome when the claim was not even pleaded here. And if there were no preclusive effect, there would be a risk of inconsistent rulings from two different presiding judges.

*see also* ECF No. 56-16 (Decision of Proposed Suspension).  The reasonable accommodation

claim relates to Plaintiff's complaints about her various workstations between 2017 and 2019.  *See*

ECF No. 59 at 18–22.  As to any other claims (except for those based on the denial of her request

to participate in a management certification program and the reduction of leave), Plaintiff has con-

ceded Defendant's motion for summary judgment not only under the principle that "a party [who]

fails to address an argument that is put forth in a dispositive motion . . . may be deemed [to have]

conceded [it]," *Antoine v. U.S. Bank Nat'l Ass'n*, 821 F. Supp. 2d 1, 6 (D.D.C. 2010), and its

corollary principle that a court "is not obliged to make argument on [a party's] behalf," *James v.*

*Miche Bag Corp.*, No. 11-cv-963, 2012 WL 13072049, at *2 (D.D.C. Mar. 30, 2012); but also

because Plaintiff has explicitly asserted that she opposes summary judgment only as to the speci-

fied claims.

### A.    Factual Background[5]

1.    Evidence Related to Removal of Job Duties

Plaintiff began her employment with the Department in November 2013 as a contractor in

the position of Senior Agricultural Scientific Advisor (Biofuels) in the Office of Global Analysis,

Global Policy Analysis Division, Foreign Agricultural Service.  ECF No. 59-1 at 3, ¶¶ 7–8.  The

position was classified as GS-14.[6]  *Id.*  Sometime thereafter, because the contract under which she

was working in that position was terminating, Plaintiff applied for and accepted a position as an

Agricultural Economist (also in the Office of Global Analysis, Global Policy Analysis Division of

---

[5] The following facts are undisputed except where noted.

[6] "GS" stands for "General Schedule," which is a classification and pay system that "covers the majority of civilian white-collar Federal employees . . . in professional, technical, administrative, and clerical positions." , *General Schedule Overview*, U.S. Office of Personnel Management, https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/general-schedule/#:~:text=The%20General%20Schedule%20(GS)%20classification,percent%20of%20the%20employee's%20salary [https://perma.cc/97DZ-B29T].  It has fifteen grades: GS-1, which is the lowest, to GS-15, which is the highest.  *Id.*

the Foreign Agricultural Service) at the GS-13 level, where she worked from December 2015 to May 2016. *Id.*, ¶¶ 9–10.

Effective May 15, 2016, Plaintiff was reassigned from her position as an Agricultural Economist in the Office of Global Analysis to the position of International Economist in the Office of Agreements and Scientific Affairs, Plant Division, Foreign Agricultural Service. *Id.*, ¶ 11; *see also* ECF No. 72-9 at 1. According to the job description, employees in that position "provid[e] economic analysis and evaluation of trade policies and practices affecting the U.S. agricultural industry" and "plan[] and coordinat[e] policies and positions on highly complex trade issues." ECF No. 72-9 at 1. As an International Economist, Plaintiff was to, among other things, serve as an advisor on international economic analysis theories and principles; analyze issues relating to the World Trade Organization, regulatory agreements, legislation and trade barriers; conduct specialized studies and analyses regarding trade agreements, trade barriers, international trade mechanisms and procedures, and other matters affecting U.S. agricultural trade; provide authoritative economic analysis for Foreign Agricultural Service officials; and represent the agency as a technical expert at meetings with other agencies and consult with staff of domestic and foreign industry and trade associations. *Id.* at 1–2. The reassignment letter from Paul Trupo, Director of the Global Policy Analysis Division, explains that Plaintiff was appointed at the GS-13 level and was to "continue [her] current portfolio of work on biofuels policy and sustainability issues in [the] new position." ECF No. 72-7 at 1. That letter also reports that the reassignment was made because the Department had determined that "current biofuel trade policy work typically dealing with non-tariff barriers, such as sustainability issues and anti-dumping investigations [was] a more appropriate fit in [the Office of Agreements and Scientific Affairs] as it is outside of [the Office of Global Analysis'] core mission of market intelligence and analysis." *Id.* Plaintiff asserts that,

since her hiring in 2013, she had been the Foreign Agricultural Service's lead expert on biofuels, *see, e.g.*, ECF No. 59-1 at 28–30, ¶¶ 6–7, 10, and that when she was reassigned various managers, including Trupo and Daniel Whitley, who was then Deputy Administrator of the Office of Global Analysis, promised that she "would be returned to [her] GS-14 position" (presumably a position with duties similar to the duties she performed when hired as a contractor in November 2013), ECF No. 59-2 at 17, a claim that both officials deny, *see* ECF No. 72-5 at 8–9 (Trupo Aff.); ECF No. 72-6 at 3, 6 (Whitley Aff.).  In her new position as an International Economist in the Office of Agreements and Scientific Affairs, Plaintiff's supervisors were Mayra Caldera, Deputy Director of the Plant Division (first line); Mark Rasmussen, Director of the Plant Division (second line); and Charles Bertsch, the Acting Deputy Administrator of the Office of Agreements and Scientific Affairs (third line).[7]  ECF No. 59-1 at 4, ¶ 14; *see also* ECF No. 72-1 at 3.

Plaintiff maintains that, beginning in August 2017 through January 2018, job duties were removed from her purview "on a regular and consistent basis" and, after January 2018, "on a less regular and consistent basis."  ECF No. 59-2 at 21.  She asserts that the first instance of a duty being removed occurred on August 1, 2017, when she was not allowed to participate in an "ethanol meeting" with the company Archer Daniels Midland.  *Id.* at 148 n.1.  Thereafter, she alleges in broad strokes curtailment in her "providing expert scientific advice and counsel on biofuels and

---

[7] Plaintiff alleges that Katherine Nishiura, who was apparently the Assistant Deputy Administrator in the Office of Agreements and Scientific Affairs, "alternated [with Bertsch] as her third line supervisor" but the document she cites as support—Exhibit 4 to her opposition—does not mention Nishiura's name.  *See* ECF No. 59-1 at 4, ¶ 14; ECF No. 59-2 at 145–51 (Plaintiff's Exhibit 4).  The Court therefore does not credit that assertion.  *See, e.g.*, *Jimenez v. Mayorkas*, No. 21-5193, 2023 WL 2607385, at *2 n.2 (D.C. Cir. Mar. 23, 2023) (noting that when a party fails to properly support a fact at the summary judgment stage, "the district court is under no obligation to sift through the record" to find such support (quoting *SEC v. Banner Fund Int'l*, 211 F.3d 602, 616 (D.C. Cir. 2000)); *Ladd v. Chemonics Int'l, Inc.*, 603 F. Supp. 2d 99, 105 (D.D.C. 2009) (noting that, if the party opposing summary judgment does not properly controvert a factual assertion by the movant, the Court should treat the movant's "factual assertions [that] are properly supported by the record . . . as admitted").  In any case, whether Nishiura was Plaintiff's third-line supervisor is not material here.

bioenergy, directing studies on bioenergy-related issues, serving as the primary [Foreign Agricul-tural Service] contact for scientific issues, representing the agency on biofuels and bioenergy in international meetings, and more." *Id.* at 147. She also provides specific examples of meetings she was allegedly excluded from and speeches she was prevented from giving, including a National Security Council meeting on biofuel trade in September 2017, a "[b]ilateral government meeting with South Korea" in May 2018, a meeting with the Virginia Secretary of Agriculture sometime in 2018, a speech to the United Nations Food and Agricultural Organization in Paraguay in De-cember 2018, a speech at the Global Bio-Energy Partnerships' Bio Energy week in the Philippines in early 2019, and various other meetings and speaking engagements in the United States and abroad. *Id.* at 147–48. She asserts that the bulk of these duties were transferred to a man, Phillip Jarrell, *see* ECF No. 59 at 12; ECF No. 59-2 at 640–44, who was at that time a GS-15 Senior Advisor to the Deputy Administrator of the Office of Agreements and Scientific Affairs, Robert Macke, *see* ECF No. 72-4 at 3, 9–10.[8]

---

[8] Plaintiff asserts in her Response to Defendant's Statement of Material Facts that when she "complained to . . . Macke about the transfer of duties to Jarrel, he told her, that 'I was a young lady with a lot of potential to offer the agency.'" ECF No. 59-1 at 32, ¶ 19. However, the evidence she cites to support this—"Exhibit 1, ROI" (an abbreviation of Report of Investigation) "page 150", *see id.*—does not appear in the record of this case. Plaintiff's Exhibit 1 contains pages 212–329, 2012–15, and 3029–37 of the Report of Investigation. *See* ECF No. 59-2 at 1–128; *see also* ECF No. 59 at 12–13. There is some indication that she was called a "lady" in a page from Plaintiff's affidavit that she cites in her opposition, but according to that document, the comment was not made by Macke, but by Rasmussen. *See* ECF No. 59-2 at 6; *id.* at 5–7) ("I complained further about the illegality of my pay to Mark [Rasmussen] on that same day [that is, October 2, 2017] including that you're taking away my duties and giving them to a GS-15 male when I have received nothing but praise for my work and he is not qualified nor has he worked on biofuels policy. Upon being referred to as a lady during this discussion, I indicated that I do not know what me being a lady had to do with it."). Plaintiff also asserts, again citing a page from the Report of Investigation that does not appear in the record, that at some point during a conversation with Rasmussen about a request she received from "industry" for Plaintiff and Caldera to travel, Rasmussen asserted that a request must be made to him, stating that "talking to you two ladies does not constitute talking to FAS" because "they need to come in here and speak to me." ECF No. 59-1, ¶ 20 (citing Exhibit 1, page 134). The Court therefore does not credit those statements. *See, e.g.*, *Jimenez*, 2023 WL 2607385, at *2 n.2 (noting that when a party fails to properly support a fact at the summary judgment stage, "the district court is under no obligation to sift through the record" to find such support (quoting *Banner Fund Int'l*, 211 F.3d at 616)). In any event, as discussed below in section III.A, even if the Court were to assume that Macke and Rasmussen made those statements, it would not change the outcome of Plaintiff's gender discrimination claim.

Defendant denies that the Department took duties away from Plaintiff, arguing rather that she "misconce[ived] . . . her duties and role." ECF No. 72 at 12. The government notes that Plaintiff's position description remained the same during her tenure as an International Economist; that she was hired as an economist and providing expert scientific advice was not among her job duties, which focused on trade policy; that the Office of the Deputy Administrator moved some of the work Plaintiff complains about losing to the Bilateral Agreements and Enforcement Division "to coordinate how the Office formulates policy for a broad spectrum of commodities"; that biofuels meetings during her tenure were attended by Deputy Administrator Macke; and that the office generally worked in teams and its fast-paced environment often necessitated calling on other employees on an ad hoc basis to assist with issues that arose. *See id.* at 11–12; *see also* ECF No. 72-1 at 8–10 (Caldera Aff.); ECF No. 72-2 at 9 (Rasmussen Aff.); ECF No. 72-4 at 7–10 (Macke Aff.). Addressing the meetings and events Plaintiff asserts she was prevented from attending, Defendant points out that she "was allowed more travel than any other Plant Division employee" and that many of the meetings she says she was prevented from attending occurred at times she was traveling for work or otherwise out of the office; travel was also restricted by budget constraints. ECF No. 72 at 13–15; *see also* ECF No. 72-1 at 49 (Caldera Aff.); ECF No. 72-2 at 9, 26–27 (Rasmussen Aff.).

2.    Evidence Related to the Five-Day Suspension and its Lead-Up

In November 2017, Plaintiff began to have interpersonal issues with colleagues. According to a sworn statement by Julie Chao, who occupied the cubicle next to Plaintiff, on November 1, 2017, she found Plaintiff lying on the floor in the aisle by Plaintiff's workspace, which obstructed Chao's path to her desk; Plaintiff would not move and instructed Chao to step over her, which made Chao uncomfortable. *See* ECF No. 56-8 at 5. Chao asserts that the next day when she

arrived at work, Plaintiff was sitting in a chair in the aisle with her legs stretched across the aisle and feet resting on Plaintiff's desk chair, leaving only a "very tight space to clear" for Chao to get to her workstation.  *Id.* at 6.  Plaintiff moved her legs when asked.  *See id.*  Chao emailed her supervisor Rasmussen, who come to the office and observed Plaintiff with her legs stretched across the aisle, after which Chao spoke to Rasmussen in his office about her discomfort with Plaintiff's behavior.  *See id.*  Rasmussen asked Chao to leave the premises while he spoke to Plaintiff.  *See id.*  Chao reported that, when she returned to the office, Plaintiff told her, "No one likes a two-faced bitch."  *Id.*  Plaintiff asserts that Chao "perjured her statement" and "made [it] up."[9]  ECF No. 59-2 at 37.

Another colleague, Cheryce Howard, attested in a sworn affidavit that on November 8, 2017, Plaintiff approached her in an aggressive manner regarding a work issue, then "stomped out of the office and said, 'Fucking Bitch!' which caused Howard to fear for her safety.  ECF No. 56-9 at 6, 8.  Plaintiff asserts that she "did not do anything to [Howard]" and that it was Howard "who was in the wrong that day."  ECF No. 59-2 at 35.

---

[9] Plaintiff makes many assertions regarding this incident in her Response to Defendant's Statement of Materials Facts, but few, if any, of them are supported by the exhibits she cites.  For example, Plaintiff asserts that she "provides an account of the alleged incidents" with Chao "in her EEO Affidavit," citing "Exhibit 1, pages 239–243."  ECF No. 59-1, ¶ 15.  However, although Plaintiff does, on one of those pages, accuse Chao of fabricating a statement about Plaintiff's "previous weight training," *see* ECF No. 59-2 at 31 (page 241 of the Report of Investigation), there is no "account" of the details of the relevant encounters with Chao in those pages or indeed in any of the surrounding pages that discuss the investigation of this incident in November 2017 and its aftermath, *see id.* at 30–44 (pages 240–54 of the Report of Investigation).  Plaintiff cites "Exhibit 4" to support her assertions that Chao asked Plaintiff to stay on the floor because she could see Plaintiff was in pain, that Plaintiff's legs did not block access to Chao's workstation, that Rasmussen told Plaintiff that Chao "never complained to him about [Plaintiff]," that Plaintiff and Chao "were friendly and Chao shared food with Plaintiff," and that Plaintiff did not call Chao a "two-faced bitch."  ECF No. 59-1, ¶¶ 19–23.  However, Exhibit 4 to Plaintiff's opposition—an affidavit from Plaintiff dated September 3, 2024—includes nothing that supports those assertions.  *See generally* ECF No. 59-2 at 145–51.  The Court therefore does not credit them.  *See, e.g.*, *Jimenez*, 2023 WL 2607385, at *2 n.2 (noting that when a party fails to properly support a fact at the summary judgment stage, "the district court is under no obligation to sift through the record" to find such support (quoting *Banner Fund Int'l*, 211 F.3d at 616)).  Moreover, some of those statements appear to be inadmissible hearsay and others are immaterial.

Those incidents spurred an investigation that began on November 13, 2017. ECF No. 59-1 at 7, ¶ 29. In connection with that investigation, Plaintiff was placed on full-time telework, which lasted from November 13, 2017, until April 4, 2018. *Id.* at 25, ¶100; ECF No. 59-2 at 46. Meanwhile, on November 26, 2017, Plaintiff sent an email to the Director of the Early Resolution and Conciliation Division of the Department's Office of the Assistant Secretary for Civil Rights complaining of "workplace bullying" and expressing that she did not feel comfortable speaking about her complaint with Foreign Agricultural Service personnel. ECF No. 59-2 at 647–48. On December 1, 2017, Rasmussen issued Plaintiff a Letter of Caution for leaving his office during a discussion of Chao's complaint and for refusing to attend an earlier meeting on the topic, finding that Plaintiff's "unprofessional" behavior "hinder[ed] the efficiency of the service." ECF No. 59-1 at 8, ¶¶ 30–32. Plaintiff was cautioned that further misconduct might subject her to discipline. *Id.* at 8, ¶ 33.

An intake report from a Foreign Agricultural Service EEO counselor indicates that Plaintiff contacted that office on December 20, 2017. ECF No. 56-12 at 2. Plaintiff filed a formal EEO complaint on March 5, 2018 (the details of which are discussed below in Section I.B). See ECF No. 56-3 at 3. On March 8, 2018, Caldera issued Plaintiff a Letter of Caution unrelated to the complaints by Chao and Howard. *See* ECF No. 56-13 at 2. It asserted that Plaintiff violated Department Regulation 4070-735-001, entitled "Employee Responsibilities and Conduct," by (1) disobeying a January 12, 2018, directive from Caldera to consolidate Plaintiff's files and personal items to facilitate a workstation relocation, and (2) failing to follow a policy regarding the use of a shared inbox notwithstanding reminders from Caldera about the policy in October and December 2017 and February 2018. *See id.*; ECF No. 59-1 at 9, ¶¶ 36–37.

11

Plaintiff returned to the office on April 4, 2018, after teleworking for nearly five months. ECF No. 59-1 at 25, ¶ 100; ECF No. 59-2 at 46.  On May 29, 2018, Plaintiff was issued a Letter of Reprimand for displaying disrespectful conduct in the workplace when, in early November 2017, she threatened Chao and called her a "two-faced bitch" and when she acted aggressively toward Howard and used the term "fucking bitch," again in violation of Departmental Regulation 4070-735-001.  ECF No. 59-1 at 10, ¶¶ 39, 41.

On November 26, 2018, Caldera issued Plaintiff a Notice of Proposed 5-Day Suspension with two specifications for failure to follow instructions.  ECF No. 56-15 at 2.  First, it charged that on October 30, 2018, Plaintiff was directed to return her 2018 performance evaluation to Caldera by the next day and, when that did not occur, Plaintiff was directed on November 5, 2018, to return it by the end of that day.  *Id.*; *see also* ECF No. 59-1 at 10–11, ¶ 45.  The form had not been returned as of November 8, 2018.  ECF No. 56-15 at 2.  Second, it asserted that, on November 13, 2018, Caldera had directed Plaintiff to attend a meeting on November 14, 2018, at 1:00 p.m., but Plaintiff did not attend the meeting.  *Id.*  Plaintiff asserts in an affidavit that she told Caldera that before returning the evaluation, she wanted to discuss with her attorney whether she should sign it given her pending EEO complaint.  *See* ECF No. 59-2 at 150.  She also points to Department Regulation 4040-430, which, at the time of these events, provided that a performance rating could be changed "[w]ithin 60 days of issuance based on an informal request by the employee," ECF No. 59-2 at 180, 153, asserting the regulation allows an employee 60 days "to lobby the rating official to change the rating" and arguing that "the most logical deduction an employee would make is that the act of handing in the form terminates that period of time to change the evaluation," ECF No. 59-1 at 12, ¶ 45.  Plaintiff also points out that, as to the second specification, she had requested sick leave on November 14, 2018.  *Id.*  The emails in the record show that Plaintiff

reported to Caldera at 11:59 a.m. on November 14 that she had thrown up and her back had seized and she needed to take sick leave for the remainder of the day.  ECF No. 59-2 at 201.  Caldera denied the request for sick leave "until 1:30 p.m. today," thus requiring Plaintiff to attend the 1:00 p.m. meeting.  *Id.*

On February 25, 2019, Assistant Deputy Administrator Nishiura issued a decision uphold-ing the proposed five-day suspension that sustained the specification related to the performance evaluation because Plaintiff admitted she had not returned the form by the required date and "did not provide any evidence that [she was] granted an extension by [her] superior" but dismissed the specification related to the November 14, 2018, meeting, finding that Plaintiff's "use of sick leave prevented [her] from attending the meeting."  ECF No. 56-16 at 2.  In meting out the suspension, Nishiura "share[d] the concern" of Caldera regarding Plaintiff's failure to follow instructions and considered the Letter of Reprimand Plaintiff was issued on May 29, 2018, regarding the complaints of Chao and Howard.  *Id.* at 3.  Plaintiff's suspension began on March 6, 2019, and she returned to work on March 11, 2019.  *Id.* at 2.

### 3.    Evidence Related to Failure to Accommodate

Plaintiff alleges that she suffers from musculoskeletal disorders stemming from a 2008 automobile accident.[10]  *See* ECF No. 59-1 at 34–35, ¶ 38; ECF No. 56-1 at 18.  It appears that Plaintiff first began complaining about her workspace in July or early August 2017, when she

---

[10] The Rehabilitation Act borrows the definition of "disability" from the Americans with Disabilities Act ("ADA"), which, in turn, defines a person with a "disability" as an individual with "a physical or mental impairment that sub-stantially limits one or more major life activities," a person with "a record of such an impairment," or a person "re-garded as having such an impairment."  42 U.S.C. § 12102(1); *see* 29 U.S.C. § 705(9)(B) (incorporating the definition of "disability" from the ADA into the Rehabilitation Act).  Defendant does not mount a serious argument that Plaintiff is not disabled as defined by the Rehabilitation Act, although it notes that in 2015 and 2016 she trained for and com-peted in "Strong Woman competitions outside of work."  ECF No. 56-1 at 19; *see also* ECF No. 56-24.  In any case, there is at least an issue of fact as to whether she has such an impairment.  *See* ECF No. 59-2 at 10–11 (Plaintiff listing her diagnoses and asserting that they interfered with major life activities).  The Court therefore assumes for the pur-poses of this motion that Plaintiff has a disability as defined in the statute.

requested Rasmussen provide her a keyboard tray.[11]     *See* ECF No. 59-1 at 24, ¶ 96 (Plaintiff admitting that her contact with Rasmussen was on August 7, 2017); *id.* at 35, ¶ 40 (Plaintiff asserting that initial contact with Rasmussen was in July 2017 and citing Rasmussen's affidavit, ECF No. 59-2 at 123, which supports that statement). Rasmussen communicated Plaintiff's complaints to the "Reasonable Accommodation Coordinator" of the Foreign Agricultural Service. *See* ECF No. 59-2 at 125. The ergonomics program evaluated Plaintiff's workstation on August 24, 2017, and provided a report on September 6, 2017, which recommended a keyboard tray. *See* ECF No. 59-1 at 24–25, ¶ 98; ECF No. 56-25 at 3. Rasmussen ordered the keyboard tray on September 26, 2017. ECF No. 59-1 at 24, ¶ 97. In the meantime, Plaintiff was provided a loaner keyboard tray.[12] *Id.* at 25, ¶ 99. On September 28, 2017, she was also offered the opportunity to change offices while awaiting the arrival of the tray, an offer she refused. *See* ECF No. 72 at 21 (citing ECF No. 56-25 at 6). The tray was installed on November 7, 2017, a few days before Plaintiff was ordered to telework because of the investigation into the incidents with Chao and Howard. ECF No. 56-1 at 19; ECF No. 56-2 at 24–25, ¶ 98.

When Plaintiff returned from enforced telework on April 4, 2018, she had been moved to a different workstation; she complained that the keyboard tray installed at the workstation cut into her legs. *See* ECF No. 59-1 at 25, ¶ 101; *id.* at 36, ¶ 45; ECF No. 59-2 at 46. Another ergonomic evaluation was conducted, and a new keyboard tray was ordered on May 2, 2018. ECF No. 59-1

---

[11] A "keyboard tray" is an ergonomic accessory generally mounted under a desk to hold a computer keyboard and mouse.

[12] Plaintiff asserts that the loaner keyboard tray "was only supposed to be used for a week or two" and caused her "a lot of leg pain because it cut into the circulation of her legs," citing Exhibit 4, her September 3, 2024, affidavit. ECF No. 59-1 at 25, ¶ 99. However, the cited affidavit does not support either of those allegations. *See* ECF No. 59-2 at 150. The Court therefore does not credit them. *See, e.g.*, *Jimenez*, 2023 WL 2607385, at *2 n.2 (noting that when a party fails to properly support a fact at the summary judgment stage, "the district court is under no obligation to sift through the record" to find such support (quoting *Banner Fund Int'l*, 211 F.3d at 616)). In any case, those statement, if true, are not material to the dispute.

at 25, ¶¶ 102–03.  Plaintiff was offered the option to telework in the meantime.[13]  *Id.*, ¶ 102.  The new keyboard tray was installed on May 23, 2018.  *Id.* at 25, ¶ 103.  In October 2018, Plaintiff, then in Room 3005, complained again about her keyboard tray and another ergonomic evaluation was conducted.[14]  *See* ECF No. 56-26 at 11 (October 31, 2018, Ergonomics Evaluation).  That October 31, 2018, evaluation found that the tray was improperly installed and reported that a "quick fix" was accomplished but that the keyboard tray would "fall apart" if "bumped or touched in the wrong way."  *Id.*  Plaintiff does not point to any further complaints in the record about the keyboard tray in Room 3005 and, indeed, in February 2019, Plaintiff asked that it be moved to her new office in Room 3846.  *See* ECF No. 59-2 at 624.  It was installed there by February 13, 2019, although Plaintiff then asked for it to be reinstalled slightly to the left of where it was originally placed.  *See id.* at 622–23.  Finally, on March 4, 2019, Plaintiff's workspace in Room 3846 was inspected by Rodney Grimes, an employee of the facilities department.  *See* ECF No. 56-22 at 6–7 (Grimes Test.); ECF No. 59-2 at 626.  Grimes testified at a hearing before the Merit Systems Protection Board that he found nothing wrong with the keyboard tray in Room 3846.[15]  ECF No. 56-22 at 8 (testifying that "everything was normal").  However, an ergonomic evaluation dated March 2019 found that the keyboard tray in that room was improperly installed and no adjustments

---

[13] There is a dispute about whether Plaintiff took the offer to telework or declined it, but no dispute that telework was offered.  *See* ECF No. 59-1 at 25, ¶ 102.

[14] The photographs in the ergonomic evaluations indicate that Plaintiff had again moved offices between April 2018 and October 2018.  *Compare* ECF No. 56-26 at 4 *with id.* at 8.

[15] Plaintiff cites an email she sent in March 2019 that asserts, "On Monday, March 4, Rodney [Grimes] of Facilities inspected my desk in Room 3846-S and determined that it is his expert opinion that he cannot fix the keyboard tray . . ." ECF No. 59-2 at 626.  The statement from Grimes to Plaintiff appears to be hearsay and will therefore not be considered for the truth of the matter asserted.  *See Greer v. Paulson*, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (finding that "'sheer hearsay . . . counts for nothing' on summary judgment" (quoting *Gleklen v. Democratic Cong. Campaign Comm.,* 199 F.3d 1365, 1369 (D.C. Cir. 2000))).

could be made to it.[16]  ECF No. 59-2 at 631.  It also reported that Plaintiff did not want the keyboard

tray replaced with a different model and was "working with her supervisor to move to room

4603."[17]  *Id.*  Emails from Plaintiff dated March 4, 2019, also indicate that she asked to be moved

to that room.[18]  *See id.* at 626–27.

    As noted above, Plaintiff was placed on suspension from March 6, 2019, to March 10,

2019, inclusive.  ECF No. 56-16 at 2.  On April 4, 2019, she was placed on administrative leave

for an investigation related to the suspension of her security clearance on April 2, 2019, and was

prohibited from reporting to her duty station.  ECF No. 56-17 at 2.  It appears that leave lasted

until her removal on June 2, 2020.  *See* ECF No. 56-23.  Again, this Memorandum Opinion and

---

[16] Plaintiff claims that the March 2019 ergonomic evaluation shows that the Department failed to make proper adjustments to her workstation in October 2018.  *See* ECF No. 59-1 at 26, ¶ 104.  It does not, as the workstation evaluated in in March 2019 was in Room 3846, whereas the workstation evaluated in October 2018 was in Room 3005.  Even if it was the same keyboard tray—there is evidence that the keyboard tray from Room 3005 was moved to Room 3846, *see* ECF No. 59-2 at 624—whether it was reinstalled improperly in Room 3846 does not shed light on whether it was properly adjusted in Room 3005.

[17] Plaintiff claims that the problems with her workstation in Room 3846 were "never fixed at least until she was removed from her position," citing Exhibit 4, her September 3, 2024, affidavit.  ECF No. 59-1 at 39, ¶ 69.  That affidavit does not support the claim.  *See* ECF No. 59-2 at 150.  Instead, the section of the affidavit related to her reasonable accommodation claims asserts (1) that she has a disability that was exacerbated in 2017 and (2) that the reason she was given for her move to Room 3846—that her workstation in Room 3005 "was needed for others"—was false.  *Id.*

[18] Those emails further indicate that Plaintiff complained about the air conditioning, ventilation, and lighting in Room 3846; Plaintiff mentions issues with the lighting and air conditioning in her Response to Defendant's Statement of Material Facts.  *See* ECF No. 59-1 at 38, ¶¶ 62, 64; ECF No. 59-2 at 627.  However, the allegations in the operative complaint say nothing about lighting, air conditioning, or ventilation.  *See generally* ECF No. 16-2.  The Court therefore does not consider them.  *See, e.g.*, *District of Columbia v. Barrie*, 741 F. Supp. 2d 250, 263 (D.D.C. 2010) ("It is well established hat a party may not amend its complaint or broaden its claims through summary judgment briefing."); *Klayman v. Jud. Watch, Inc.*, 628 F. Supp. 2d 112, 126 (D.D.C. 2009) (refusing to consider on summary judgment allegations not included in the operative complaint).  In any event, Plaintiff's complaints related to lighting, air conditioning, and ventilation do not make out a failure to accommodate claim because there is no evidence that Plaintiff's complaints were related to her claimed musculoskeletal impairments.  *See, e.g.*, *Hill v. Assocs. for Renewal in Educ., Inc.*, 897 F.3d 232, 237 (D.C. Cir. 2018) ("The requested accommodation 'must be related to the limitation that rendered the person disabled.'" (quoting *Adams v. Rice*, 531 F.3d 936, 944 (D.C. Cir. 2008))); *Bassett v. Walsh*, No. 22-cv-2408, 2023 WL 4999176, at *6 (D.D.C. Aug. 4, 2023) (dismissing a failure to accommodate claim where the plaintiff "[did] not allege that his request" for an accommodation "was related to his disability").

Order does not address Plaintiff's termination, which is at issue in *Robb v. Rollins*, No. 21-cv-2056.

**B.    Procedural History**

The record shows that Plaintiff first contacted an EEO counselor at the Foreign Agricultural Service on December 20, 2017. *See* ECF No. 56-12 at 2. She filed a formal EEO complaint on March 5, 2018. *See* ECF No. 56-3 at 3. According to the operative complaint in this action, Plaintiff amended her formal EEO complaint on March 22, 2018; May 9, 2018; July 13, 2018; August 1, 2018; March 26, 2019; and June 1, 2019. ECF No. 16-2 at 23, ¶ 215. The allegations accepted by the Department for decision were whether management subjected Plaintiff to discrimination and harassment based on sex, disability, and reprisal when it (1) removed portions of her duties beginning in August 2017; (2) investigated her and placed her on full-time telework beginning on November 13, 2017; (3) issued the March 8, 2018, Letter of Caution; (4) failed to provide her an ergonomic workstation since April 4, 2018; (5) issued the May 29, 2018, Letter of Reprimand; (6) subjected her to a misconduct investigation; (7) denied her travel and training opportunities; (8) intimidated, devalued, and degraded her between July and November 2017; (9) issued the December 8, 2017 Letter of Caution; and (9) blamed her, excluded her, micromanaged her, failed to respond to her leave requests in a timely manner, and interfered with her work products.[19] ECF No. 56-3 at 2–3.

Plaintiff requested a hearing before the EEOC on December 3, 2018. *See id.* at 3. On October 24, 2019, the EEOC remanded the case to Department to issue a final agency decision. *See id.* That decision was issued on January 22, 2020, and found that "[t]he weight of the evidence

---

[19] Some of those categories appear to overlap.

indicates discrimination and harassment did not occur with respect to the issues" accepted for decision. *Id.* at 31.

Plaintiff filed this action on April 7, 2020. *See* ECF No. 1. Defendant filed a motion to dismiss, ECF No. 8; Plaintiff filed an opposition and, simultaneously, a motion to amend her complaint. *See* ECF Nos. 15, 16. As noted above, Judge Contreras granted in part and denied in part both motions, leaving the claims discussed here on which Defendant has moved for summary judgment, as well as retaliation and discrimination claims based on a denial of a training request and an improper reduction of her leave, on which Defendant has not moved for summary judgment. *See generally Robb*, 2021 WL 3036796.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate when the moving party demonstrates that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it 'might affect the outcome of the suit under the governing law,' and a dispute about a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the non[-]moving party.'" *Steele v. Schafer*, 535 F.3d 689, 692 (D.C. Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Initially, the moving party has the burden of demonstrating the absence of a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

Once the moving party has met this burden, the non-moving party must designate "specific facts showing that there is a genuine issue for trial." *Id.* at 324. To establish that a fact is or is not genuinely disputed, a party must (a) cite specific parts of the record—including deposition testimony, documentary evidence, affidavits or declarations, or other competent evidence—in support

of its position, or (b) demonstrate that the materials relied upon by the opposing party do not actually establish the absence or presence of a genuine dispute. Fed. R. Civ. P. 56(c)(1). While the Court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor, *Grosdidier v. Broad. Bd. of Governors*, 709 F.3d 19, 23–24 (D.C. Cir. 2013), the non-moving party must show more than "[t]he mere existence of a scintilla of evidence in support of" his or her position; instead, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Anderson*, 477 U.S. at 252. Moreover, the non-moving party "'may not rest upon mere allegation or denials of his pleading' but must present 'affirmative evidence' showing a genuine issue for trial." *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987) (quoting *Anderson*, 477 U.S. at 256–57); *Ass'n of Flight Attendants–CWA, AFL–CIO v. U.S. Dep't of Transp.*, 564 F.3d 462, 465–66 (D.C. Cir. 2009) (conclusory assertions without support from record evidence cannot create a genuine dispute). Indeed, a moving party may succeed on summary judgment simply by pointing to the absence of evidence proffered by the non-moving party. *Anderson*, 477 U.S. at 249–50 ("If the [non-movant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted." (internal citations omitted)).

It is well established that "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge at summary judgment." *Barnett v. PA Consulting Grp., Inc.*, 715 F.3d 354, 358 (D.C. Cir. 2013) (quoting *Pardo-Kronemann v. Donovan*, 601 F.3d 599, 604 (D.C. Cir. 2010)). Indeed, a court's role in deciding a summary judgment motion is not to "determine the truth of the matter, but instead [to] decide only whether there is a genuine issue for trial." *Id.* (quoting *Pardo-Kronemann*, 601 F.3d at 604). Moreover, district courts approach summary judgment motions in employment

discrimination or retaliatory action cases with "special caution" due to the "potential difficulty for a plaintiff . . . to uncover clear proof of discrimination or retaliatory intent." *Nurriddin v. Bolden*, 40 F. Supp. 3d 104, 115 (D.D.C. 2014) (quoting *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879–80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc)). Nonetheless, a plaintiff is still obligated to support his or her allegations by competent evidence. *Id.* Accordingly, a plaintiff may not avoid summary judgment through "conclusory allegations and speculation." *Id.*

### B.    Discrimination and Retaliation Based on Discrete Acts

The federal sector provision of Title VII provides that "[a]ll personnel actions affecting [federal] employees or applicants for [federal] employment . . . shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. §§ 2000e-16(a). The government is also prohibited from retaliating against an employee or applicant for engaging in protected activities such as filing an EEO complaint alleging employment discrimination. *See Rochon v. Gonzales*, 438 F.3d 1211, 1216 (D.C. Cir. 2006).

When a Title VII plaintiff does not offer direct evidence of discrimination or retaliation, courts apply the three-step burden-shifting framework set forth in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973). *See Holcomb v. Powell*, 433 F.3d 889, 895 (D.C. Cir. 2006). Under that framework, the plaintiff must initially establish a *prima facie* case by a preponderance of the evidence. *McDonnell Douglas*, 411 U.S. at 802. The three essential elements of a Title VII disparate treatment claim are that the plaintiff (1) is a member of a protected class; (2) suffered adverse employment action; and (3) was treated differently from similarly situated employees outside the protected class. *See, e.g.*, *Nichols v. Billington*, 402 F. Supp. 2d 48, 65 (D.D.C. 2005), *aff'd*, No. 05-5326, 2006 WL 3018044 (D.C. Cir. Mar. 7, 2006); *see also Augustus v. Locke*, 934

F. Supp. 2d 220, 230 (D.D.C. 2013).  Similarly, to establish a *prima facie* case of retaliation, a plaintiff must show that (1) she engaged in statutorily protected activity, (2) she suffered materially adverse employment action, and (3) a causal connection exists between the protected activity and the challenged retaliatory act.  *Rochon*, 438 F.3d at 1219–20.  Once the plaintiff succeeds in making her *prima facie* showing, the burden of production shifts to the employer, who must articulate a legitimate, non-discriminatory or non-retaliatory reason for the challenged action.  *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981).  If the employer successfully does so, the burden shifts back to the plaintiff to prove that the employer's proffered reason is a pretext masking discrimination or retaliation.  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).

In employment discrimination and retaliation cases, summary judgment usually focuses on whether the employer can articulate non-discriminatory or non-retaliatory reasons for its actions. Where an employer has done so, "the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case." *Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in the original).  Even in *Brady*, however, the D.C. Circuit implicitly recognized that the plaintiff must "suffe[r] an adverse employment action" before the reasons for that action, benign or discriminatory, can be evaluated.  *Id.*  Both the courts of this District and subsequent panels of the D.C. Circuit have recognized that proceeding to the *Brady* analysis may be premature when the defendant contests whether an adverse employment action occurred at all. *See, e.g., Baloch v. Kempthorne*, 550 F.3d 1191, 1196 (D.C. Cir. 2008); *Beckham v. Nat'l R.R. Passenger Corp.*, 736 F. Supp. 2d 130, 146 (D.D.C. 2010); *cf. Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019) ("*Brady*'s suggested preference for merits resolution on the third prong [of the *McDonnell Douglas* framework] is just that—a suggestion, which the District Court should follow only when feasible.").

If an adverse employment action occurred, the "central question" on summary judgment then becomes whether the employee "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory or non-retaliatory reason was not the actual reason and that the employer intentionally discriminated or retaliated against the employee." *Walker v. Johnson*, 798 F.3d 1085, 1092 (D.C. Cir. 2015) (quoting *Allen v. Johnson*, 795 F.3d 34, 39 (D.C. Cir. 2015)). The D.C. Circuit has clarified that, in answering the central inquiry of *Brady*, a district court should consider "whether the jury could infer discrimination from the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's prof-fered explanation for its actions; and (3) any further evidence of discrimination that may be avail-able to the plaintiff . . . or any contrary evidence that may be available to the employer." *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012) (alteration in original) (quoting *Aka*, 156 F.3d at 1289); *cf. Brady*, 520 F.3d at 494 n.2 (noting that the question of whether a plaintiff was treated differently from a similarly situated employee who was not a member of the protected class is "relevant to the determination at summary judgment or trial whether intentional discrimination occurred").

A plaintiff may carry the rebuttal burden with evidence demonstrating that "the employer is lying about the underlying facts" that formed the predicate for the employment action, *Brady*, 520 F.3d at 495, or otherwise by "presenting enough evidence to allow a reasonable trier of fact to conclude that 'the employer's proffered explanation is unworthy of credence,'" *Desmond v. Mukasey*, 530 F.3d 944, 962 (D.C. Cir. 2008) (quoting *Burdine*, 450 U.S. at 256). But "[i]f the employer's stated belief about the underlying facts is reasonable in light of the evidence, . . . there ordinarily is no basis for permitting a jury to conclude that the employer is lying." *Brady*, 520 F.3d at 495. A plaintiff may also come forward with comparative evidence that persons who are

22

similarly situated to the plaintiff but are of a different race, sex, or age have not engaged in protected activity have been treated more favorably by the employer. *Id.*

Showing pretext requires more than simply criticizing the employer's decision-making process. "Title VII, it bears repeating, does not authorize a federal court to become 'a super-personnel department that reexamines an entity's business decisions.'" *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (quoting *Dale v. Chi. Tribune Co.*, 797 F.2d 458, 464 (7th Cir. 1986)). Indeed, a court "may not 'second-guess an employer's personnel decision absent demonstrably discriminatory [or retaliatory] motive.'" *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (quoting *Milton v. Weinberger*, 696 F.2d 94, 100 (D.C. Cir. 1982)).

## C.    Failure to Accommodate

To make out a case of disability discrimination under the Rehabilitation Act for failure to accommodate, a plaintiff must show "(1) that [s]he was an individual with a disability within the meaning of the statute; (2) that the employer had notice of h[er] disability; (3) that with reasonable accommodation [s]he could perform the essential functions of the position; and (4) that the employer refused to make such accommodations." *Scarborough v. Natsios*, 190 F. Supp. 2d 5, 19 (D.D.C. 2002) (quoting *Rhoads v. FDIC*, 257 F.3d 373, 387 n.11 (4th Cir. 2001)). At trial, plaintiff bears the burden of proving each of those elements by a preponderance of the evidence.[20] *See Flemmings v. Howard Univ.*, 198 F.3d 857, 861 (D.C. Cir. 1999).

---

[20] Failure to accommodate claims are not subject to the burden-shifting framework of *McDonnell Douglas*. "When a disabled plaintiff alleges a failure to make a reasonable accommodation . . . she need not explain why her employer has failed to accommodate her. The failure to accommodate is itself discriminatory." *Floyd v. Lee*, 968 F. Supp. 2d 308, 315–16 (D.D.C. 2013). That is, "it is discriminatory for a covered employer to decline to take reasonable steps to accommodate an employee's disability, unless the steps in question 'would impose an undue hardship on the operation of the business' of the employer." *Id.* at 316 (quoting *Aka*, 156 F.3d at 1300). Because "[t]he employer's motivation for refusing the accommodation plays no part in that analysis, . . . reasonable-accommodation claims are 'not subject to analysis under *McDonnell Douglas*.'" *Id.* (quoting *Aka*, 156 F.3d at 1288).

The fourth prong of the standard contemplates "'a flexible give-and-take' between employer and employee 'so that together they can determine what accommodation would enable the employee to continue working.'" *Ward v. McDonald*, 762 F.3d 24, 32 (D.C. Cir. 2014) (quoting *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 805 (7th Cir. 2005)). So, "[t]o establish that a request for a reasonable accommodation was denied, a plaintiff must show either that the employer 'ended the interactive process' necessary to 'determine an appropriate accommodation' or 'that [the employer] participated in the [interactive] process in bad faith.'" *Tobey v. U.S. Gen. Servs. Admin.*, 480 F. Supp. 3d 155, 168 (D.D.C. 2020) (quoting *Ward*, 762 F.3d at 31–32)). Accordingly, in evaluating a failure to accommodate claim

> courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary. A party that obstructs or delays the interactive process is not acting in good faith. A party that fails to communicate, by way of initiation or response, may also be acting in bad faith. In essence, courts should attempt to isolate the cause of the breakdown and then assign responsibility.

*Ward*, 762 F.3d at 32 (quoting *Sears*, 417 F.3d at 805). To be clear, "[a]n employer is not liable for denying an accommodation request if it participated 'in good faith' in an 'interactive process' aimed to satisfy the request." *Weatherspoon v. Azar*, 380 F. Supp. 3d 65, 73 (D.D.C. 2019) (quoting *Ward*, 762 F.3d at 32); *see also Cogdell v. Murphy*, No. 19-cv-2462, 2020 WL 6822683, at *7 (D.D.C. Nov. 20, 2020) ("[T]he interactive-process line of cases provides that an employer does not deny an accommodation unless it 'end[s] the interactive process or . . . participate[s] in the process in bad faith.'" (alterations in original) (quoting *Ward*, 762 F.3d at 32)). "To demonstrate good faith, an employer can: 'meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered [the] employee's request, and offer and discuss available alternatives when the request is too burdensome.'" *Ward v. Shinseki*, No.

10-cv-1414, 2012 WL 5839711, at *6 (D.D.C. Nov. 19, 2012) (quoting *Woodruff v. LaHood*, 777 F. Supp. 2d 33, 41–42 (D.D.C. 2011)), *aff'd sub nom. Ward v. McDonald*, 762 F.3d 24.  On the other hand, obstruction or delay of the interactive process or failure to communicate is suggestive of bad faith.  *Ward*, 762 F.3d at 32.

To be sure, "whether a requested accommodation is 'reasonable' is typically a question of fact for the jury," to be decided "based on all the circumstances of the case."  *Swormstedt v. Santa Maria Valley R. Co.*, No. 04-cv-0372, 2004 WL 5458405, at *5 (C.D. Cal. Apr. 13, 2004); *see also Noll v. IBM Corp.*, 787 F.3d 89, 94 (2d Cir. 2015) ("The reasonableness of an . . . accommodation is a 'fact-specific' question that often must be resolved by a factfinder.").  In this Circuit, however, courts have not hesitated to find that relatively short delays in the provision of accommodations were reasonable as a matter of law.  *See, e.g.*, *Weatherspoon*, 380 F. Supp. 3d at 71–73 (holding that a four- or six-month delay in providing an accommodation "was reasonable as a matter of law" and granting summary judgment in the employer's favor).

## III.    DISCUSSION

### A.    Gender Discrimination

As noted, Plaintiff claims that management's removal of certain job duties and responsi-bilities from August 2017 onward[21] constituted discrimination based on her gender.  *See* ECF No. 59 at 5 ("Plaintiff's duties and responsibilities were reduced by her upper level managers, princi-pally Mark Rasmussen, her second line supervisor and Robert Macke, the Deputy Administrator for [the Office of Agreements and Scientific Affairs], based on her gender.").  Defendant's first

---

[21] In its opening brief, Defendant argues that "[o]f the matters accepted for EEO investigation, the earliest involved conduct began in July 2017, and thus . . . conduct prior to that time is unexhausted."  ECF No. 56-1 at 28.  Plaintiff does not argue otherwise—indeed, she asserts that the first instance of "her duties being removed was . . . on August 1, 2017," ECF No. 59 at 9 n.1, and her opposition brief focuses entirely on conduct from July 2017 onward.  *See id.* at 3 n1 ("Plaintiff's claims are all from July, 2017 and on.  Any mention of any earlier time period is for background purposes only.").  Accordingly, there is no need for the Court to address Defendant's exhaustion argument.

argument in response is that Plaintiff's duties were not in fact reduced, which the Court takes as an argument that the evidence does not show that Plaintiff suffered an adverse employment action. The notion is that the duties and responsibilities Plaintiff complains of losing were not within the job description of an International Economist and were not promised to her. *See* ECF No. 72 at 9–12. This argument has significant appeal, and some of the evidence Plaintiff herself highlights supports it. Specifically, in insisting that her job duties were reduced, Plaintiff cites the duties and responsibilities applicable to an "Agricultural Science [or Scientific] Advisor (Biofuels)," even indicating that they were "duties from her position description." *See* ECF No. 59-1 at 27, ¶¶ 4–5. However, it is undisputed that in August 2017, that was not her job title, nor had it been since December 2015. *See id.* at 3–4, ¶¶ 7–11 (explaining that Plaintiff worked as a Senior Agricultural Scientific Advisor (Biofuels) from November 2013 to December 2015, as an Agricultural Economist from December 2015 to May 2016, and as an International Economist from May 2016). The fact that a position Plaintiff did not occupy had duties she wanted or was able to perform does not show that such duties were removed from the portfolio of the job she did have. And her assertion that various managers told her she would be returned to a GS-14 position—an assertion disputed by every manager with an affidavit in the record, *see* ECF No. 72-1 at 13 (Caldera Aff.); ECF No. 72-2 at 11–12 (Rasmussen Aff.); ECF No. 72-3 at 13 (Bertsch Aff.); ECF No. 72-4 at 14 (Macke Aff.); ECF No. 72-5 at 8–9 (Trupo Aff.); ECF No. 72-6 at 6 (Whitley Aff.)—says nothing about whether the duties of that hypothetical GS-14 position would have matched those she claims were taken away. Indeed, Plaintiff's only evidence that job duties were taken away from her (or that she was not allowed to perform duties promised to her) is her own affidavit asserting that beginning in August 2017 duties she had been performing—presumably in the position of International Economist, which she began in May 2016—were removed. *See, e.g.*, ECF No. 59-2 at 5, 23 (stating

that the first instance of a duty being taken away was on August 1, 2017, and that in September 2017 management gave Plaintiff's duties to Jarrell). Nonetheless, under D.C. Circuit precedent, that is sufficient to create a genuine issue of fact on this issue. *See, e.g.*, *Camara v. Mastro's Rests. LLC*, 952 F.3d 372, 374–75 (D.C. Cir. 2020) (stating that assertions setting out admissible facts in "self-serving affidavits," unless conclusory or made without personal knowledge, must be considered on summary judgment).

Plaintiff has not, however, created an issue of material fact as to whether the alleged reduction of her duties constituted gender discrimination. As noted, generally the "central question" on summary judgment is whether the employee "produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated [or retaliated] against the employee." *Brady*, 520 F.3d at 494. Here, Defendant has provided a profusion of non-discriminatory reasons that Plaintiff did not perform various duties and did not attend various events that she thinks she should have, including that some duties were not within her job description; that other duties were assigned to other divisions or to more senior staff; that the nature of the work in the office required ad hoc assignments of duties or work in teams; and that Plaintiff's travel schedule and the Department's budget constraints interfered with her participation in certain events.[22]  *See* ECF No. 72 at 11–15;

---

[22] In *Figueroa*, the D.C. Circuit stressed that, although the primary focus of the *McDonnell Douglas* test at the summary judgment stage should be the third prong—whether evidence in the record supports an ultimate inference of discrimination or retaliation—that "does not pretermit serious deliberation at the second prong," where the employer must present a non-discriminatory or non-retaliatory reason for the adverse employment actions at issue. 923 F.3d at 1086–87.  The court offered "four factors that, in most cases, [will] determine whether an employer's evidentiary proffer is adequate": (1) whether the employer has "produce[d] evidence that a factfinder may consider at trial (or a summary judgment proceeding)"; (2) whether the evidence would support a reasonable belief "that the employer's action was motivated by a nondiscriminatory reason"; (3) whether the nondiscriminatory reason is "facially credible in light of the proffered evidence"; and (4) whether the evidence presents a "clear and reasonably specific explanation" such that the employee had "a full and fair opportunity to attack the explanation as pretextual."  *Qian Ye v. Off. of Senate, Sergeant at Arms*, No. 17-cv-1332, 2019 WL 3344458, at *6 (D.D.C. July 25, 2019) (quoting *Figueroa*, 923 F.3d at 1088).  Here, Plaintiff has neither cited *Figueroa* or its progeny nor challenged the sufficiency of Defendant's showing on the second prong.  Instead, she appears to contend (Plaintiff's opposition is not always a model of clarity) that Defendant's showing is deficient because it failed to establish that Plaintiff's allegations about the duties and

*see also* Section I.A.1, *supra*. The burden thus shifts to Plaintiff to show that those "reasons were pretextual, and the real reasons were prohibited discrimination" by

> citing the employer's better treatment of similarly situated employees outside the plaintiff's protected group, its inconsistent or dishonest explanations, its deviation from established procedures or criteria, or the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff, or other relevant evidence that a jury could reasonably conclude evinces an illicit motive.

*Walker*, 798 F.3d at 1092.

Plaintiff tries a few such approaches, but none succeed. Her overarching argument seems to be that she had knowledge and experience that would have furthered the Department's mission and provided value to industry players—such as Archer Daniels Midland—had she been able to use it. *See* ECF No. 59 at 10–11. But even if decisions made by management impeded certain salutary outcomes—and there is no evidence that they did—that does not mean, or even tend to show, that those decisions were discriminatory. "[T]he role of a court in assessing an alleged Title VII violation 'is not to review bad business decisions, or question the soundness of an employer's judgment.'" *Robinson v. Paulson*, 591 F. Supp. 2d 78, 91 (D.D.C. 2008) (quoting citing *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 549 (6th Cir. 1991)); *see also Morris v. Emory Clinic*, 402 F.3d 1076, 1081 (11th Cir. 2005) (noting that a court's "task . . . is not to second-guess" whether the action complained of "was a good or bad business decision by the [employer]," it is to determine whether the employer used sex as a basis to treat the plaintiff less favorably, which requires some evidence that "sex played

---

responsibilities that were removed from her purview are untrue. *See, e.g.*, ECF No. 59 at 11–12 ("[T]here is an absence of direct counterargument to Ms. Robb's specific allegations about the removal of her duties during [this] timeframe."). Whether or not that is an accurate description of Defendant's briefing, *see* ECF No. 72 at 12 (arguing that Plaintiff "misconce[ived] . . . her duties and role" as an International Economist in the Office of Agreements and Scientific Affairs), it does not address a defendant's burden at the second step, which is to offer a legitimate non-discriminatory or non-retaliatory reason for an adverse employment action. It is not the Court's job "to make arguments on [a party's] behalf." *James*, 2012 WL 13072049, at *2; *see also Loumiet v. United States*, 65 F. Supp. 3d 19, 25 (D.D.C. 2014) ("[C]ourts will not make arguments for the litigants." (quoting *Oak Ridge Care Ctr., Inc. v. Racine Cnty.*, 896 F. Supp. 867, 876 (E.D. Wisc. 1995))). Nevertheless, the Court has examined the government's arguments and evidence on this issue and finds that they satisfy the *Figueroa* test.

[a] role in the . . . determination"); *Johnson v. Univ. of Wisc.-Eau Claire*, 70 F.3d 469, 481 (7th Cir. 1995) ("Even a 'bad' business decision does not violate Title VII if the basis of the decision is neither discriminatory nor retaliatory."), *abrogated in part on other grounds by Spiegla v. Hull*, 371 F.3d 928 (7th Cir. 2004).

Second, Plaintiff targets some specific instances of alleged disparate treatment. She asserts that many of her "responsibilities and duties were transferred to a male, Phil Jarrell." ECF No. 59 at 12. Deputy Administrator Macke explained that Jarrell was a GS-15 Senior Advisor in the Office of the Deputy Administrator with experience "in the grain sector, which include[s] biofuels and their related products," on whom Macke relied to provide "high level policy guidance" rather than the "daily technical expertise on certain aspects of biofuels" that was provided by personnel in the Plant Division, like Plaintiff. *See* ECF No. 72-4 at 9–10. To the extent Plaintiff attempts to show that non-discriminatory reason is pretextual because she and Jarrell were similarly situated and he was treated more favorably, she fails. Although the D.C. Circuit has stated that the question of "whether two employees are similarly situated is ordinarily a question of fact for the jury," to survive summary judgment, a plaintiff must present sufficient comparator evidence "from which a jury could reasonably conclude . . . that one or more of the proposed comparator[s] . . . were similarly situated to [the plaintiff] in all relevant respects." *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1116 (D.C. Cir. 2016). To do so, she must provide "evidence suggesting that the employer treated other employees of a different [gender] . . . more favorably in the same factual circumstances." *Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 301 (D.C. Cir. 2015) (ellipsis in original) (quoting *Brady*, 520 F.3d at 495). "At the summary judgment stage, the Court 'must rely on evidence substantiated by the record' to conclude that the plaintiff and an asserted comparator are similarly situated." *Burton v. District of Columbia*, 153 F. Supp. 3d 13, 67 (D.D.C. 2015) (quoting *Anyaso v. U.S. Capitol*

*Police,* 39 F. Supp. 3d 34, 43 (D.D.C. 2014), *aff'd sub nom. Nelson v. District of Columbia*, 689 F.

App'x 642 (D.C. Cir. 2017).  "[I]f a reasonable jury would be unable to find that the plaintiff and

the comparator were similarly situated, the court may decide, as a matter of law, that the two are not

similarly situated[.]"  *Id.*  "A plaintiff must . . . demonstrate that 'all of the relevant aspects of her

employment situation were nearly identical to those of the male' employee." *Holbrook v. Reno,* 196

F.3d 255, 261 (D.C. Cir. 1999) (quoting *Neuren v. Adduci, Mastriani, Meeks & Schill,* 43 F.3d 1507,

1514 (D.C.Cir.1995)).  "'[T]he similarly situated inquiry is not a mechanical comparison,' but 're-

quires enough common factors to determine if intentional discrimination was at play' by 'eliminat-

ing confounding variables, such as differing roles, performance histories, or decision-making per-

sonnel, which helps isolate the critical independent variable: complaints about discrimination.'"

*Burton*, 153 F. Supp. 3d at 67 (quoting *Hnin v. TOA (USA), LLC,* 751 F.3d 499, 504–505 (7th Cir.

2014)).

Plaintiff has not accomplished that here.  She does not provide *any* details of Jarrell's "job

description, . . . experience, education, [or] other qualifications."  *Poullard v. McDonald*, 829 F.3d

844, 855 (7th Cir. 2016).  The information that is in the record—courtesy of Defendant—establishes

that Plaintiff and Jarrell had different positions in the administrative hierarchy, different job titles,

and different GS levels:  Plaintiff was a GS-13 International Economist in the Plant Division of the

Office of Agreements and Scientific Affairs, Jarrell a GS-15 Senior Advisor to the Deputy Admin-

istrator of the Office of Agreements and Scientific Affairs.  *See* ECF No. 59-1 at 4, ¶ 11; ECF No.

72-4 at 9.  "The D.C. Circuit has repeatedly held that employees with different positions or seniority

levels are not 'similarly situated.'"  *Liu v. Georgetown Univ.*, No. 22-cv-157, 2024 WL 4362128, at

*10 (D.D.C. Sept. 30, 2024) (collecting cases); *see also, e.g.*, *Moreno-Livini v. AFL-CIO Housing*

*Inv. Tr.*, No. 24-cv-1392, 2024 WL 4144112, at *3 (D.D.C. Sept. 11, 2024) (noting that differences

in job titles is an indication that two employees are not similarly situated); *Bennett v. Solis*, 729 F. Supp. 2d 54, 62 (D.D.C. 2010) (noting that the fact that the plaintiff and the proposed comparator had difference titles and different GS levels "tends toward a finding that the two weren't similarly situated"). In short, Plaintiff has not shown that Jarrell is an appropriate comparator such that a reasonable jury could find that Defendant's non-discriminatory explanation for the assignment of duties is pretextual.

Next, to suggest that gender played a role in the assignment of duties to Jarrell, Plaintiff alleges that when she complained to Macke, he stated that she "was a young lady with a lot of potential to offer the agency." ECF No. 59 at 12–13. As noted above in note 8, Plaintiff does not properly support that allegation of fact, so the Court does not credit it. But even crediting it, it does not suggest that Defendant's non-discriminatory reason for the asserted transfer of duties was a pretext for gender discrimination. First, courts have found that a term that "is neither positive nor negative on its face" or in context "cannot be used to establish pretext." *Jimenez v. Maricopa Unified Sch. Dist.* No. 07-cv-2558, 2009 WL 10673605, at *18 (D. Ariz. Sept. 15, 2009) (citing *Steinhauer v. DeGolier*, 359 F.3d 481, 487 (7th Cir. 2004) ("[T]here is nothing inherently anti-male about th[e] phrases ['guys' and 'good old boys' club'], and their use in no way creates a reasonable inference that sex motivated an employment decision, any more than the use of 'gals' or 'good old girls' club' would indicate an anti-female animus.")), *aff'd*, 415 F. App'x 779 (9th Cir. 2011); *see also Robinson v. Dodaro*, 767 F. Supp. 2d 185, 194 (D.D.C. 2011) ("It is the plaintiff's burden to provide evidence beyond his or her own subjective assertions of discrimination suggesting that a facially neutral term or phrase was, in fact, discriminatory."). Plus, "'one-off comment[s]'" like that alleged here are generally "the type of 'stray remark[s]' that [are] insufficient to support an inference of discriminatory intent." *Herrnson v. Hoffman*, No. 19-cv-7110, 2023 WL 2647603, at *3 (S.D.N.Y.

Mar. 27, 2023) (quoting *Naumovski v. Norris*, 934 F.3d 200, 216 (2d Cir. 2019)).  For example, in

*Dungee v. Northeast Foods, Inc.*, the defendant passed over the female plaintiff and instead hired a

male candidate.  940 F. Supp. 682, 684 (D.N.J. 1996).  In a letter of explanation, the company

asserted that the plaintiff—described therein as "a lady with varied life experiences"—was the "first

choice until [the company] spoke to the young man" they ultimately hired, who had more extensive

pertinent experience.  *Id.* at 684 n.1.  The court found the references to the plaintiff as a "lady" and

the individual who was hired as a "young man" were mere stray remarks insufficient to show pretext.

*See id.* at 687–88.  Similarly, an explanation offered by a decisionmaker that the plaintiff had not

been hired because she had not been a "good girl" was found insufficient to show a discriminatory

motive.  *Overall v. Univ. of Penn.*, No. Civ. A. 02-1628, 2003 WL 23095953, at *6–7 (E.D. Pa. Dec.

19, 2003), *rev'd in part on other grounds*, 412 F.3d 492 (3d Cir. 2005).  Likewise, the First Circuit

found in *Morales-Cruz v. University of Puerto Rico* that references by decisionmakers to the plain-

tiff as "that girl" in discussions related to the employment decision at issue did not support a rea-

sonable inference of gender discrimination.  676 F.3d 220, 225–26 (1st Cir. 2012); *see also Galvin*

*v. Catholic Bishop of Chi.*, 863 F. Supp. 770, 773, 777 n.13 (N.D. Ill. 1994) (finding that a statement

made by the decisionmaker during a heated exchange, "Lady"—or perhaps "little lady"—"I'll chew

your ass out any time I want" was "insufficient to raise a genuine issue as to [the decisionmaker's]

discriminatory animus"); *cf. Weisbrot v. Med. Coll. of Wisc.*, 79 F.3d 677, 684 (7th Cir. 1996) (find-

ing that, although a reference by the decisionmaker to the plaintiff as an "'older lady' . . . might

demonstrate some sort of bias against older employees," because of the "isolated nature of th[e]

comment and the positive context in which it was made, no rational factfinder could con-

clude . . . that [the employer] lied about its reason for terminating [the plaintiff]"); *Ruggles v. Kee-*

*bler Co.*, 224 F. Supp. 2d 1295, 1304 (D. Kan. 2002) (finding, in an age discrimination case, that a

32

decisionmaker's email stating that the company would start recruiting "with the young lady we interviewed in Wichita" was not evidence of pretext "[e]ven if the term 'young lady' reflects a focus on a female's age," because it was merely a stray remark).  These cases indicate that Macke's alleged single use of an ostensibly neutral phrase—but one that can be demeaning in certain contexts and seems ill-advised here—is, without more, insufficient evidence of discriminatory animus to over-come a defendant's assertion of non-discriminatory reasons for the actions at issue.  *Cf. Estelle v. Simpson Trucking & Grading, Inc.*, No. 17-cv-273, 2020 WL 13653836, at *11 (N.D. Ga. Feb. 3, 2020) (finding that, where the challenged employment action was the failure to promote a woman to a position as a tractor-trailer driver, a comment from the decisionmaker that "he could not have 'little ladies out on the demolition sites'" was evidence of discriminatory intent), *report and recom-mendation adopted*, 2020 WL 13653842 (N.D. Ga. Mar. 23, 2020); *Milligan-Jensen v. Mich. Tech. Univ.*, 767 F. Supp. 1403, 1409, 1413 (W.D. Mich. 1991) (finding that a decisionmaker's angry response to the female plaintiff's request to change shifts that "You're the woman, aren't you?" and "You have the lady's job.  Don't you like it?" which the decisionmaker then documented in the plaintiff's personnel file, "was not an ambiguous, isolated comment without wider implications"), *judgment rev'd on other grounds*, 975 F.2d 302 (6th Cir. 1992).  That is especially true here, where the evidence in support of Plaintiff's prima facie case is so insubstantial.  *See Hamilton*, 666 F.3d at 1351 (instructing that to determine whether an employment action was discriminatory or retaliatory, a court must consider the evidence supporting the plaintiff's *prima facie* case in combination with the other proof); *see also Montgomery v. John Deere & Co.*, 169 F.3d 556, 560–61 (8th Cir. 1999) (finding that where the plaintiff's prima facie case was, "at best, weak," evidence of derogatory comments was not a sufficient basis for an inference of discriminatory animus); *Winiarski v. Conn. Dep't of Pub. Health*, 273 F. Supp. 2d 189, 192 (D. Conn. 2003) ("[W]hen a prima facie case is

weak, and evidence of pretext is also weak, a plaintiff must have other evidence of discrimination to sustain her ultimate burden of proof." (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000))).[23]

For these reasons, Defendant is entitled to summary judgment on Plaintiff's gender discrimination claim.

### B.   Retaliation

Although Plaintiff mentions in her opposition "a series of discipline issued against her, such as letters of instructions, warnings, [and] a reprimand," her arguments in support of her retaliation claim relate only to her five-day suspension.  *See* ECF No. 59 at 5 ("Plaintiff opposes her suspension based on retaliation"); *id.* at 13–16 (discussing only the proposed suspension).[24]  The Court therefore deems Plaintiff to have conceded that no other disciplinary actions support such a claim.[25]

As noted, the proposed suspension contained two specifications—one that Plaintiff failed to attend a meeting with Caldera on November 14, 2018, and one that Plaintiff did not timely return her performance review form.  *See* ECF No. 56-15 at 2.  The ultimate suspension was based only on Plaintiff's failure to return her performance review form, because Assistant Deputy

---

[23] Similarly, Plaintiff also points to an alleged comment by Rasmussen, Director of the Plant Division, during a "UES review discussion" that an industry representative "talking to you two ladies"—that is, Plaintiff and Caldera—about a request for them to travel "does not constitute talking to" the Foreign Agricultural Service and that such requests needed to go through him.  ECF No. 59 at 13.  Again, Plaintiff does not properly support the factual allegation that Rasmussen made such a comment, so the Court does not credit it.  *See* note 8, *supra*.  In any case, that is merely another stray remark insufficient to show pretext.  *See, e.g.*, *Morales-Cruz*, 676 F.3d at 225–26; *Montgomery*, 169 F.3d at 560–61; *Overall*, 2003 WL 23095953, at *6–7; *Dungee*, 940 F. Supp. at 687–88.  Indeed, it is even weaker evidence of pretext than that discussed above, because Plaintiff does not link it to a specific employment decision of which she complains.  Instead, she asserts only that it was made in connection with a "UES review" without explaining what that is.

[24] Although the substantive discussion in Plaintiff's opposition discusses only the *proposed* suspension and not the suspension itself, the Court will address both.

[25] As noted, this Memorandum Opinion and Order does not address Plaintiff's termination, which is at issue in *Robb v. Rollins*, No. 21-cv-2056.

Administrator Nishiura found that Plaintiff's "use of sick leave prevented [her] from attending the meeting."  ECF No. 56-16 at 2.

The Court finds that the proposed suspension based on Plaintiff's failure to attend the meeting with Caldera is not an adverse employment action sufficient to support a retaliation claim.  In *Muldrow v. City of St. Louis*, the Supreme Court recently reaffirmed that "Title VII's anti-retaliation provision . . . applies only when the retaliatory action is 'materially adverse,' meaning that it causes 'significant' harm."  601 U.S. 346, 348 (2024) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006)).  The Court explained that "[t]he test was meant to capture those employer actions serious enough to 'dissuade[] a reasonable worker from making or supporting a charge of discrimination.'  An action causing less serious harm will not deter Title VII enforcement and so falls outside the purposes of the ban on retaliation."  *Id.* (quoting *White*, 548 U.S. at 68).  The standard is "objective and captures only 'significant,' rather than 'trivial,' harms," which "'[t]ypically . . . involve[] "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing significant change in benefits."'"  *Watkins v. Dep't of Just.*, No. 23-cv-766, 2024 WL 4362156, at *9 (D.D.C. Sept. 30, 2024) (first and second alterations in original) (first quoting *White*, 548 U.S. at 68; and then quoting *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013)).  With respect to proposed suspensions, courts have found that they are not materially adverse actions where the plaintiff did not ultimately serve the suspension.  *See, e.g.*, *Spence v. U.S. Dep't of Veteran's Affs.*, 109 F.4th 531, 540 (D.C. Cir. 2024) ("And [the plaintiff] never served her proposed suspension, so that is not a materially adverse action . . .").  To be sure, here Plaintiff was ultimately suspended for five days; however, her suspension was not based on the failure to attend Caldera's meeting.  Thus, that proposed specification did not cause *any* harm, let alone "cause[] 'significant' harm."  *Muldrow*, 601

U.S. at 348 (quoting *White*, 548 U.S. at 68); *cf. Román v. Castro*, 149 F. Supp. 3d 157, 172 (D.D.C. 2016) ("Here, even though the proposed suspension did occur, Román has not shown that the Proposal to Suspend had effects independent of the suspension itself. Her claim that the proposal was retaliatory therefore cannot survive summary judgment."). Put another way, a suspension based on the failure to attend the meeting did not ultimately occur, so that specification cannot be the basis for a retaliation claim. *See Jones v. Castro*, 200 F. Supp. 3d 183, 188–89 (D.D.C. 2016) ("'[A] long line of cases from this Circuit and others have held that threats, *revoked disciplinary plans*, and other such ultimately unconsummated actions are not materially adverse for purposes of retaliation claims.' That is, actions that *would* have been materially adverse *if* consummated were not materially adverse actions because they were *never* ultimately consummated." (first emphasis added) (citations omitted) (quoting *McNair v. District of Columbia*, 903 F. Supp. 2d 71, 75–76 (D.D.C. 2012))).

As to the failure to return the performance review form—which did form the basis of her suspension—Plaintiff insists that she has shown that that "justification for the suspension . . . is untrue." ECF No. 59 at 16. Sometimes, discrediting the employer's asserted non-retaliatory reason for its employment decision will be enough to overcome the employer's motion for summary judgment. *See Aka*, 156 F.3d at 1292. But here, Plaintiff attempts to do so by setting up a straw man. She points to deposition testimony from Caldera that the only complete copy of the review form was given to Plaintiff. ECF No. 59 at 14; *see also* ECF No. 59-1 at 11. Then, through a (frankly, opaque) theory involving two handwritten notes on the bottom of one page of the form—one stating, "Employee refused to sign. See employee comments"; the other stating, "I am not signing as I believe the narrative summary violates EEO law, contains libel, and is further EEO retaliation until such time as that language is corrected," ECF No. 59-2 at 661, Plaintiff contends that she has shown

that the copy given to her was not the only copy of the form and further reasons that, therefore, she did not need to return that copy because "[i]f it wasn't the only copy, then there was no harm done by [Plaintiff] not handing the document back to Caldera."  ECF No. 59 at 14.  But the proposed suspension does not rest on a notion that the form needed to be returned because it was the only copy.  It was premised on Plaintiff's failure to follow instructions on two occasions:

> Specification 1:  On October 30, 2018 I instructed you to return your AD435E by October 31, 2018.  I provided you additional opportunity on November 5, 2018 when I directed you via e-mail to return your original AD435E to me by close of business.  As of November 8, 2018, you did not provide your AD435E form to me.

ECF No. 56-15 at 2.  That specification was "sustained," and Plaintiff was suspended because she "admitted [she] did not return the form by the [deadline]" and "did not provide any evidence that [she] was granted an extension."  ECF No. 56-16 at 2.  That is, the suspension was proposed and imposed because Plaintiff did not follow the instructions of her supervisor.  *See* ECF No. 56-15 at 3; 56-16 at 3.  The question of whether there was only one copy of the form is a sideshow.

Plaintiff also asserts that she had "a reason not to meet the short deadline to return the evaluation."  ECF No. 59 at 14.  But that is immaterial here.  "Ultimately, it 'is not this Court's job to decide if defendant's proffered reasons were wise, fair, or correct, but rather, whether defendant honestly believed those reasons and acted in good faith upon those beliefs.'"  *Hartzler*, 2022 WL 15419995, at *19 (quoting *Crockett v. Richardson*, 127 F. Supp. 2d 40, 47 (D.D.C. 2001)).  "[T]he core inquiry" on summary judgment is thus "whether [Plaintiff] has produced sufficient evidence for a reasonable jury to find that [the employer] did not 'honestly believe in the reasons it offer[ed]'" for the suspension.  *Id.* (second alteration in original) (quoting *Fischbach*, 86 F.3d at 1183).  Plaintiff has admitted that she did not comply with her supervisor's instructions and has offered no evidence bearing on the Department's belief in its proffered reasons for the suspension.

Finally, Plaintiff gestures toward an argument that the Department did not follow its policies when it required her to return the evaluation form to Caldera, pointing to the section of Department Regulation 4040-430 providing that a performance rating may be changed "[w]ithin 60 days of issuance based upon an informal request by the employee to the rating and/or Reviewing Official." ECF No. 59-2 at 180; *see* ECF No. 59 at 15. From that language, she extrapolates that the purpose of the regulation is to allow the employee 60 days "to lobby the rating official to change the rating" and concludes that "the most logical deduction an employee would make is that the act of handing in the form terminates that period of time to change the evaluation." ECF No. 59 at 15. But that provision—Section 13a(9)(b)(1)—says nothing about "lobby[ing]," about the return of the rating form, or about termination of the period to seek a change in a rating; it merely allows an employee to make an "informal request" to change his or her rating and then sets a deadline by which any change may be made. Plaintiff's interpretation, far from being a "logical deduction" from the text, is wholly unfounded. It is even less plausible because the regulation explicitly states that the employee's signature on the form neither "signif[ies] that the employee agrees with the rating" nor precludes the employee from challenging the rating under Section 13a(9). ECF No. 59-2 at 177, 180. In short, Plaintiff has not shown that Caldera failed to follow the Department's procedures when she insisted on the return of the form, let alone that either Caldera or Nishiura did so in connection with the imposition of a five-day suspension as punishment for failing to follow instructions.

Defendant's motion for summary judgment as to Plaintiff's retaliation claim will therefore be granted.

C.        **Failure to Accommodate**

Plaintiff's submission on this claim is a jumble of facts—some, like allegations related to air conditioning, ventilation, and lighting, *see* note 18, *supra*, and to an office relocation, are extraneous to Defendant's alleged failure to accommodate—and provides little discernable argument on relevant issues. *See* ECF No. 59 at 16–22. Her main contentions appear to be that Defendant unreasonably delayed providing her with requested accommodations related to her workstation in the summer and fall of 2017 and the spring of 2018 and (although this is more suggested than asserted) that with respect to her last request regarding her workstation in March 2019, Defendant failed to appropriately engage in the interactive process. *See id.* at 20 ("Plaintiff's basic contention with respect to these two situations [is that] the keyboard tray was ordered weeks after . . . the Defendant told the Plaintiff it [had been] ordered . . . [and there was] no good reason for not ordering and/or installing it as soon as it could have.");[26] *id.* at 22 ("Plaintiff attests that the desk was never fixed until at least she was removed from her position.").

1.        The 2017 and 2018 Requests

"Relevant 'factors to aid in determining whether a delay [in providing an accommodation] was reasonable or unreasonable . . . includ[e] the length of the delay, the reasons for the delay, whether the employee was offered any alternative accommodations while evaluating a particular request, and whether the employer has acted in good faith.'" *Mack v. Georgetown Univ.*, No. 15-cv-793, 2017 WL 4325596, at *15 (D.D.C. Aug. 4, 2017) (alterations in original) (quoting *Elzeneiny v. District of Columbia*, 125 F. Supp. 3d 18, 38 (D.D.C. 2015)), *report and recommendation adopted*, 2017 WL 4325617 (D.D.C. Sept. 27, 2017), *aff'd*, No. 17-7139, 2018 WL 3156846 (D.C.

---

[26] This sentence that appears in Plaintiff's brief is incomprehensible as written: "The Plaintiff's basic contention with respect to these two situations the keyboard tray was ordered weeks after either the Defendant told the Plaintiff it ordered it or had no good reason for not ordering and/or installing it as soon as it could have." ECF No. 59 at 20. The Court believes the reconstruction above is a reasonable approximation of the point Plaintiff attempts to make.

Cir. May 24, 2018).  The undisputed facts as to the first two accommodation requests, as set out in

more detail above in Section I.A.3, are

(1)  Plaintiff began complaining about her workstation in July or August 2017 and re-
quested a keyboard tray.

The ergonomics program evaluated Plaintiff's workstation on August 24, 2017, and
provided a report on September 6, 2017, which recommended a keyboard tray.

Rasmussen ordered the keyboard tray on September 26, 2017.

In the meantime, Plaintiff was provided a loaner keyboard tray and was offered the
option to telework, which she refused.

The tray was installed on November 7, 2017.

(2)  When Plaintiff returned from enforced telework on April 4, 2018, she complained
about the keyboard tray in her new office.

Another ergonomic evaluation recommended a new keyboard tray.

The new keyboard tray was ordered on May 2, 2018, and installed on May 23, 2018.

Plaintiff was offered the option to telework in the meantime.

On that record, no reasonable jury could find that Defendant's responses constituted un-

reasonable delays.  The evidence is clear that Defendant engaged in the interactive process, per-

forming ergonomic evaluations and thereafter following their recommendations by ordering new

keyboard trays.  And the delays between the original complaints and the installation of the key-

board trays—fewer than four months in 2017 and fewer than two months in 2018—were not un-

reasonably long.  "A relatively short delay of a few weeks (or even a few months) in approving a

request typically does not support" a claim for unreasonable delay.  *Marks v. Wash. Wholesale*

*Liquor Co. LLC*, 253 F. Supp. 3d 312, 324 (D.D.C. 2017) (collecting cases finding delays between

15 days and several months reasonable along with cases finding an issue of fact as to reasonable-

ness was raised with delays of sixteen months and multiple years); *see also Weatherspoon*, 380 F.

Supp. 3d at 72 ("A four- or six-month wait is not inordinate time for the Department to procure the requested [accommodation].").  That is especially so where, as here, there is no evidence that the defendant failed to engage in the interactive process or acted in bad faith.[27]  *See Marks*, 253 F. Supp. 3d at 324.  Indeed, Plaintiff was offered accommodations while awaiting the new equipment.

## 2.    March 2019 Request for Accommodation

As noted, to demonstrate good faith participation in the interactive process, "an employer can:  'meet with the employee who requests an accommodation, request information about the condition and what limitations the employee has, ask the employee what he or she specifically wants, show some sign of having considered [the] employee's request, and offer and discuss available alternatives when the request is too burdensome.'"  *Ward*, 2012 WL 5839711, at *6 (quoting *Woodruf*, 777 F. Supp. 2d at 41–42).  To be sure, "the interactive process is not an end in itself," so an employee must show not only that the employer "failed to engage in an interactive process or that it cause the interactive process to break down" but also that "the result of the inadequate interactive process was the failure of the [employer] to fulfill its role in 'determining what specific actions must be taken by an employer' in order to provide the qualified individual a reasonable accommodation."  *McNair v. District of Columbia*, 11 F. Supp. 3d 1170, 16– (D.D.C. 2014) (quoting *Rehling v. City of Chicago*, 207 F.3d 1009, 1015–16 (7th Cir. 2000)).  Here, taking the evidence in the light most favorable to the Plaintiff and drawing all reasonable inferences in her favor,

---

[27] Plaintiff mentions in passing the situation in October 2018 in which she complained about her keyboard tray and personnel applied a "quick fix" on October 31, 2018, but she makes no argument that there was a failure to accommodate.  ECF No. 59 at 19.  Plaintiff does not point to evidence that she made subsequent requests regarding that keyboard tray and, indeed, she asked for that keyboard tray to be relocated to her new office.  *See* ECF No. 59-2 at 624.  The Court finds that incident does not support a failure to accommodate claim.  *See Pratt v. Sci. Applications Int'l Corp.*, No. 23-cv-417, 2024 WL 4170682, at *11 (E.D. Va. Sept. 11, 2024) (finding no basis for a failure to accommodate claim where the plaintiff did not express dissatisfaction with the accommodation provided); *Martin v. S. Ill. Univ. Sch. of Med.*, No. 16-cv-3294, 2017 WL 4780613, at *12 (C.D. Ill. Oct. 23, 2017) (similar).

*Grosdidier*, 709 F.3d at 23–24, the Court cannot say that Defendant has met its burden to show that it is entitled to judgment as a matter of law on this claim.

The record establishes that Plaintiff complained about her workstation in Room 3846, which was inspected by Grimes on March 4, 2019. *See* ECF No. 56-22 at 6–7; ECF No. 59-2 at 626. Defendant rests on the assertion that he "performed a thorough evaluation and found nothing wrong with the keyboard tray." ECF No. 72 at 22. But other evidence in the record indicates that there *was* an issue with the keyboard tray: the Ergonomics Workstation Evaluation dated "March, 2019" reports that the keyboard tray was "improperly installed causing . . . the tray to be wobbly and unstable." ECF No. 59-2 at 631; *id.* at 626–27. Defendant neither asserts nor points to evidence in the record that the Department responded in any way to that ergonomic evaluation. "A party that fails to communicate, by way of initiation or response, may . . . be acting in bad faith."[28] *Ward*, 762 F.3d at 32 (quoting *Sears*, 417 F.3d at 805); *see Kennedy v. Buttigieg*, Nos. 19-cv-2212, 19-cv-2666, 2023 WL 2561822, at *25 (D.D.C. Mar. 17, 2023) (characterizing the interactive process as a "back-and-forth between the employer and the employee . . . to identify an appropriate, reasonable accommodation"). Defendant has not mounted any argument related to March 2019 request other than that Grimes found nothing wrong with the keyboard tray. The Court will not do Defendant's work for it. *See, e.g.*, *Loumiet*, 65 F. Supp. 3d at 25 ("[C]ourts will not make arguments for the litigants." (quoting *Oak Ridge Care Ctr.*, 896 F. Supp. at 876)); *James*, 2012 WL 13072049, at *2 ("The Court is not obliged to make argument on [a party's] behalf."). So, although the evidence favoring Plaintiff "is hardly overwhelming" on this issue, the Court is

---

[28] The Court notes that the fact that at the beginning of April Plaintiff was placed on administrative leave that apparently lasted until she was terminated would not appear to make a difference here. *See Lowe v. Indep. Sch. Dist. No. 1 of Logan Cnty.*, 363 F. App'x 548, 554 (10th Cir. 2010) ("To the extent the [defendant] implies that, had [the plaintiff] not resigned, it would have continued to work with her toward a reasonable accommodation, we note that the existence of a dispute concerning the status of the interactive process raises a genuine issue of material fact as to whether the [defendant] failed in its duty to reasonably accommodate [the plaintiff].").

constrained to find that "a jury could conclude that [the Department] was responsible for [a] break-down in communication and that this prevented [it] from affording reasonable accommodations to Plaintiff in a timely manner." *McNair*, 11 F. Supp. 3d at 17.

Accordingly, Plaintiff's failure to accommodate claim concerning the March 2019 request for accommodation is the sole claim at issue that survives Defendant's motion for summary judgment.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**.  The only claim on which Defendant moved that survives is Plaintiff's failure to accommodate claim concerning her March 2019 request for accommodation.  In addition, Plaintiff's claims that Defendant discriminated and retaliated against her when it denied her request to participate in a management certification program and when it allegedly improperly reduced her leave, neither of which Defendant addressed in its motion, will also go forward.

**SO ORDERED.**

Dated:  April 7, 2025

_____
G. MICHAEL HARVEY
United States Magistrate Judge